UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

KATHLEEN HOLSCHER and GARY
HOLSCHER, wife and husband,

                    Plaintiffs,

        vs.                                    NO. CV-07-3023-EFS

DON OLSON, in his official
capacity; DALE GLASPEY, in          **ORDER ENTERING COURT'S RULINGS**
his official capacity; JIM          **FROM HEARING ON JUNE 11, 2008**
LEMON, in his official
capacity; PAT McDONALD, in
her official capacity; and
the CITY OF UNION GAP,
WASHINGTON, a municipal
corporation,

                    Defendants.

        A hearing was held in the above-captioned matter on June 11, 2008,

in Yakima.  Paul J. Burns appeared on behalf of Plaintiffs; Michael C.

Bolasina appeared on behalf of Defendants.  Before the Court were

Plaintiffs' Motion for Partial Summary Judgment: Property Interest Claim

(Ct. Rec. 31), Defendants' Motion for Summary Judgment (Ct. Rec. 38),

Defendants' Motion to Exclude Testimony of Plaintiffs' Economic Expert

for Plaintiffs' Failure to Mitigate Damages (Ct. Rec. 35), and

ORDER ~ 1

Defendants' Motion to Exclude Testimony of Plaintiffs' Expert Witness Robert Moss Under *Daubert* (Ct. Rec. 41).  After reviewing the submitted material, relevant authority, and hearing oral argument, the Court is fully informed and grants and denies in part Defendants' summary judgment motion and denies the remaining motions.  The reasons for the Court's Order are set forth below.

**BACKGROUND**[1]

In 1974, the City of Union Gap ("the City") enacted Ordinance 2.48.010, creating a city manager position.  The ordinance provides:

> There is created the office of city manager, which office shall be filled by appointment by the mayor.  The city manager shall be subject to removal by the mayor with concurrence of a majority of the council and shall serve at the pleasure of the mayor and council.

(Ct. Rec. 77 at 2.)  The City hired Plaintiff Kathleen Holscher in 1977. *Id.*  Plaintiff held a variety of positions with the City during her tenure.  *Id.*  From 1977 to 1993, she served as deputy city treasurer and deputy city clerk; from 1993 to 1995, she served as city clerk and city treasurer; and from 1995 to 2001, she served as assistant city manager, city treasurer, and city clerk.  *Id.*

In 1998, Aubrey Reeves was appointed as the City's mayor.  *Id.* at 2.  On June 5, 2001, Mayor Reeves appointed Plaintiff as city manager. *Id.*

In June 2004, seventeen (17) police department employees and seven (7) fire department employees submitted a "no confidence" petition (dated

---

[1]The following facts are undisputed.

ORDER ~ 2

April 29, 2004) to Mayor Reeves criticizing Plaintiff's performance as city manager.  *Id.* at 3.  The petition stated, in pertinent part:

>    [Plaintiff] does not promote a positive work environment for city employees.
>
>    Police officers have and are currently testing to go to other agencies stemming from problems related to [Plaintiff's] actions.
>
>    The employees have no confidence in [Plaintiff's] ability to run the city.  We feel she is not running the city in the best interest of the employees and the citizens of Union Gap.

*Id.* at 4.  The twenty-four (24) employees who signed the petition represented approximately one-third of the City's employees.  *Id.*  The City also received several letters and memoranda from employees and citizens raising concerns about Plaintiff's job performance.  *Id.*

Both Plaintiff and Mayor Reeves received the petition but did not follow up with either the police or the fire department about their concerns.  *Id.* at 4-5.  There is no evidence to suggest that the individual Defendants named in this lawsuit were in anyway involved in the petition.  *Id.* at 5.

On June 22, 2004, over two hundred City residents submitted a petition to Mayor Reeves asking Plaintiff to resign.  The petition stated, in pertinent part:

>    We . . . ask for the resignation of [Plaintiff]. [Plaintiff's] past and present conduct of city business and continued disregard for the interests of the residents makes her continued appointment as City Administrator (Manager) a liability to the City and its residents.

*Id.* at 5. Both Plaintiff and Mayor Reeves received the petition but did not follow up with the residents about their concerns.  *Id.*  There is no

ORDER ~ 3

evidence to suggest that the individual Defendants named in this lawsuit were in anyway involved in the petition. *Id.* at 5.

Due in part to the petitions, Mayor Reeves and the city council asked Northwest Small Cities Association ("NWSC") to review the City's operations. *Id.* at 6. NWSC met with nearly all the City's employees and the city council. *Id.* In November 2004, NWSC released its draft report, including the following section about Plaintiff's role as city manager:

> Most of the staff are afraid of the City Manager and therefore do not want to raise issues or concerns, even when the issues may present serious consequences if left unaddressed. The City Manager is viewed by most staff as needing to be in control; the control is perceived as taking the form of retaliation if one does not comply with her directives. Retaliation was perceived to take the form of creating conditions under which one could not properly perform the job, such as removal of job responsibilities or being cut out of communication.

*Id.* at 6. NWSC's report critiqued Plaintiff's performance in other ways as well. Both Plaintiff and Mayor Reeves did not plan to address the concerns raised in NWSC's draft report. *Id.* at 8.

On December 13, 2004, the city council approved the City's 2005 budget. *Id.* at 9. At the council meeting, council member and Defendant Dale Glaspey proposed amending the budget to eliminate funding for the city manager and assistant city manager positions; the savings would be used to hire a company to independently audit the City and to implement recommendations from NWSC's report. *Id.* at 10. The city council approved 4-3 Defendant Glaspey's proposed amendment. On December 16, 2004, Mayor Reeves vetoed the amended budget, stating that he "adamantly object[ed] to the elimination of the position of City Manager." *Id.* at 10.

ORDER ~ 4

Unable to reach an agreement, Mayor Reeves and the city council attended mediation to resolve the 2005 budget. *Id.* at 11. At mediation, the parties agreed to:

- Approve the 2005 budget, but fund the city manager position for only six (6) additional months; and

- hire a consultant to work with Plaintiff in an attempt to improve her performance and relationship with City employees

*Id.* An independent consultant met with Plaintiff twice to discuss her work performance and make recommendations for improvement. *Id.* at 12.

On July 27, 2005, two (2) weeks before funding for Plaintiff's job was set to expire, Mayor Reeves put Plaintiff on paid administrative leave. *Id.* at 13. On August 12, 2005, Mayor Reeves informed Plaintiff she was terminated due to lack of funding for her job. *Id.*

Mayor Reeves testified that it was his responsibility alone to provide Plaintiff with a *Loudermill*[2] hearing before her termination - he did not. Plaintiff recognized that a *Loudermill* hearing would have been futile because funding for her position was removed. *Id.*

From August 12, 2005, through February 22, 2008, Plaintiff did not apply for alternative employment. *Id.* at 15. Nor did Plaintiff seek employment counseling during this time. *Id.* Plaintiff has not identified any potential employers who have refused to hire her based on the circumstances surrounding her termination as the City's city manager.

Aside from back surgery in August 2005, which required two (2) months to recover, there are no physical health concerns preventing

---

[2] *See Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532 (1985).

ORDER ~ 5

1    Plaintiff from returning to work.  *Id.* at 31.  And as of February 22,
2    2008, Plaintiff could not identify any mental health issues preventing
3    her from returning to work.  *Id.* at 32.  One week after Plaintiff's
4    initial deposition, however, she visited a doctor due to recent panic
5    attacks.  *Id.* at 17.  The doctor diagnosed her with post traumatic stress
6    disorder.  While the panic attacks now prevent Plaintiff from looking for
7    alternative employment, she works "full time" on her lawsuit.  *Id.*

8         On April 30, 2007, Plaintiff filed a complaint alleging various
9    constitutional violations arising from her discharge as the City's
10   manager.  (Ct. Rec. 1.)  On April 21, 2008, the parties filed the cross
11   motions for summary judgment now before the Court.  (Ct. Recs. 31 & 38.)

12                              **DISCUSSION**

13   **I. Defendants' Motion to Exclude Re: Failure to Mitigate (Ct. Rec. 35)[3]**

14        **A. Waiver of Failure to Mitigate as an Affirmative Defense**

15        Defendants' answer does not plead "failure to mitigate" as an
16   affirmative defense.  (Ct. Rec. 7.)  While failure to mitigate damages
17   is not among the affirmative defenses enumerated in Federal Rule of Civil
18   Procedure 8(c), the Ninth Circuit has joined the overwhelming majority
19   of federal courts in concluding that lack of mitigation is a recognized
20   Rule 8 affirmative defense.  *999 v. C.I.T. Corp.,* 776 F.2d 866, 870 n.

---

22        [3]The Court notes in passing that Defendants' "motion to exclude" is
23   more properly viewed as a summary judgment motion.  Throughout their
24   motion (and reply), Defendants insist that Plaintiff failed to mitigate
25   her damages as a matter of law and no rational trier of fact could find
26   otherwise.  (Ct. Rec. 70 at 5.)

2 (9th Cir. 1985); *Modern Leasing, Inc. of Iowa v. Falcon Mfg. of Cal., Inc.,* 888 F.2d 59, 62  (8th Cir. 1989).  Failure to plead lack of mitigation of damages as an affirmative defense results in a waiver of that defense and its exclusion from the case.  *Modern Leasing,* 888 F.2d at 62; *Frederick v. Kirby Tankships, Inc.,* 205 F.3d 1277, 1286 (11th Cir. 2000), *cert. denied,* 531 U.S. 813 (2000).

Here, Defendants failed to plead lack of mitigation of damages as an affirmative defense but orally moved to amend their answer to include mitigation as an affirmative defense - Plaintiffs did not object. Because the Court granted the unopposed motion, waiver is no longer an issue.

**B. Failure to Mitigate Damages**

Defendants seek to exclude Mr. Moss' testimony about lost wages and benefits because Plaintiff failed to mitigate her damages by not seeking alternative employment since her termination from the City's employ on August 12, 2005. (Ct. Rec. 36 at 2.)  Plaintiff responds that her decision not to seek alternative employment (and her intertwined duty to mitigate) are factual issues for the jury. (Ct. Rec. 57 at 2.)

To prevail on a claim for failure to mitigate damages, a defendant must show that, based on the undisputed facts in the record, (1) there were substantially equivalent jobs available during the time in question that the plaintiff could have obtained, and (2) the plaintiff failed to use reasonable diligence in seeking alternative employment. *EEOC v. Farmer Bros. Co.,* 31 F.3d 891, 906 (9th Cir. 1994) (citations omitted). The defendant bears the burden of demonstrating that the plaintiff failed to mitigate damages. *Id.*

1    For the reasons articulated on the record, the Court finds

2  mitigation is an issue for the jury. Defendants' Motion to Exclude

3  Testimony of Plaintiffs' Economic Expert for Plaintiffs' Failure to

4  Mitigate Damages (Ct. Rec. 35) is DENIED.

5  **II. Defendants' Motion to Exclude Mr. Moss Under *Daubert* (Ct. Rec. 41)**

6    Defendants argue that Mr. Moss' testimony should be excluded under

7  Federal Rule of Evidence 702 and *Daubert* because he 1) improperly

8  estimated Plaintiff's remaining working years; 2) failed to consider

9  Plaintiff's future earning potential; 3) neglected to consider

10 Plaintiff's current pension; 4) arbitrarily calculated that Plaintiff

11 lost 15% in fringe benefits; and 5) inappropriately declined to discount

12 Plaintiff's lost future earnings to present value. (Ct. Rec. 43 at 2-3.)

13 Plaintiff responds that Mr. Moss' methodology and conclusions are

14 reliable. (Ct. Rec. 58 at 3.)

15    Federal Rule of Evidence 702 permits witnesses qualified as experts

16 by "knowledge, skill, experience, training, or education" to testify "in

17 the form of an opinion or otherwise" about "scientific, technical, or

18 other specialized knowledge" if the knowledge will "assist the trier of

19 fact to understand the evidence or to determine a fact in issue." FED.

20 R. EVID. 702 (2008). The expert's testimony must be "based on sufficient

21 facts or data" and "the product of reliable principles and methods;" the

22 expert must also apply these "principles and methods reliably to the

23 facts of the case." *Id.*

24    Trial courts must act as "gatekeepers" and decide whether to admit

25 or exclude expert testimony under Rule 702. *Daubert v. Merrell Dow*

26 *Pharm., Inc.* ("*Daubert I*"), 509 U.S. 579 (1993); *Dukes v. Wal-Mart, Inc.*,

ORDER ~ 8

509 F.3d 1168, 1179 (9th Cir. 2007). This "gatekeeping" function extends to all expert testimony, not just scientific testimony. *White v. Ford Motor Co.,* 312 F.3d 998, 1007 (9th Cir. 2002).

The Rule 702 inquiry is a flexible, fact-specific inquiry that embodies the twin concerns of reliability and helpfulness. *See Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 150 (1999); *Hemmings v. Tidyman's Inc.,* 285 F.3d 1174, 1184 (9th Cir. 2002). The test for reliability "is not the correctness of the expert's conclusions but the soundness of his methodology." *Daubert v. Merrell Dow Pharm.* (*"Daubert II"*)*,* 43 F.3d 1311, 1318 (9th Cir. 1995). Testimony that is reliable must nevertheless be helpful. The test for helpfulness is essentially a relevancy inquiry. *See Daubert I,* 509 U.S. at 591 ("Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful.") Trial courts may exclude testimony that falls short of achieving either of Rule 702's twin concerns.

### A. Qualifications

The Court first examines Mr. Moss' credentials to determine whether he is qualified to render an expert opinion. Mr. Moss received his Bachelor of Arts in Economics from the University of Michigan, his Master of Arts in Economics from American University, and conducted doctoral studies at the London School of Economics. (Ct. Rec. 44, Ex. B.) Mr. Moss' work has focused on economic-related issues for over thirty (30) years. His professional experience includes, *inter alia*, working as a consultant for the World Bank, teaching a labor economics class at Seattle University's Albers School of Business, and providing research and consulting services in labor economics. *Id.* Mr. Moss is a member

of the American Economic Association, the National Association of Forensic Economics (charter member), and the Seattle Economics Club.  In addition to being published in the Washington State Bar News and Bar Bulletin, Mr. Moss has publicly presented on several economic topics, largely to attorneys.

Based on Mr. Moss' extensive credentials, the Court finds he has the education, experience, and knowledge to qualify as an expert under Rule 702.

**B. Reliability**

Defendants argue Mr. Moss' report is unreliable because his economic methodology is based on arbitrary assumptions and unsupported economic models.  (Ct. Rec. 43 at 6.)  Plaintiff responds that Defendants' critique of Mr. Moss is nothing more than a conflict in methodology between two qualified economic experts.  (Ct. Rec. 58 at 3.)

A trial court not only has broad latitude in determining whether an expert's testimony is reliable, but also in deciding *how* to determine the testimony's reliability.  *United States v. Hankey,* 203 F.3d 1160, 1168 (9th Cir. 2000).  So while the Supreme Court did create a factor-based approach for analyzing expert testimony reliability,[4] these factors need

---

[4]These factors are: 1) whether a method can or has been tested; 2) the known or potential rate of error; 3) whether the methods have been subjected to peer review; 4) whether there are standards controlling the technique's operation; and 5) the general acceptance of the method within the relevant scientific community.  *Daubert I,* 509 U.S. at 593-94.

ORDER ~ 10

not apply to every case.  *See United States v. Prime,* 431 F.3d 1147 (9th Cir. 2005).

Defendants' specific criticisms of Mr. Moss' opinions are as follows:

### 1. Work-Life Expectancy

Defendants, relying on Daniel J. Harper, their own retained economics expert, criticize Mr. Moss' use of 1979-80 labor statistics for male employees to calculate Plaintiff's 10.9 year work-life expectancy. (Ct. Rec. 69 at 2.)  Mr. Moss explains that his approach is uniquely tailored to account for Plaintiff's gender, her length in the work force, and her role as the primary wage earner in her family.

### 2. Retired Status

Defendants also challenge Mr. Moss' assumption that Plaintiff, at 52, is retired and will earn no compensation for her remaining life. (Ct. Rec. 69 at 2.)  Mr. Moss interviewed Plaintiff and identified her as a "discouraged worker" who will not be able to find appropriate employment.  Because Plaintiff stated that she is retired, Mr. Moss assumed this in preparing his economic loss calculations.

### 3. Collateral Source Income

Defendants contend that Mr. Moss improperly calculated damages because Plaintiff's pension is not subject to the collateral source rule. (Ct. Rec. 69 at 7.)

The collateral source rule prevents a defendant from receiving the benefit of payments made to a plaintiff from a source independent of the defendant.  *Folkestad v. Burlington N.,* 813 F.2d 1377, 1380 (9th Cir. 1987); *Xieng v. Peoples Nat'l Bank,* 120 Wn.2d 512, 523 (1993).  The

ORDER ~ 11

rule's purpose is not to prevent the plaintiff from being overcompensated but rather to prevent the tortfeasor from paying twice. *Perry v. Larson,* 794 F.2d 279, 286 (7th Cir. 1986) (citations omitted).

Payments by an employer to an employee are generally not regarded as from a collateral source. *Doyne v. Union Elec. Co.,* 953 F.2d 447, 451 (8th Cir. 1992). But funds supported in part - but not entirely - by contributions from the defendant are generally considered collateral. *EEOC v. O'Grady,* 857 F.2d 383, 390 (7th Cir. 1988) (listing circuit cases supporting this premise). In Washington, the collateral source rule applies to plans that are a fringe benefit of employment. *Xieng,* 120 Wn.2d at 525.

Here, Plaintiff's pension is collateral because her retirement plan, the Washington Public Employees Retirement Plan ("WPERP"), was funded by both the public employer and Plaintiff. (Ct. Rec. 81 at 4.) Defendants do not challenge that Plaintiff paid into the WPERP, or even that the WPERP is a fringe benefit plan. Rather, Defendants argue that the collateral source rule does not apply because Plaintiff's pension plan payments were triggered not by her termination, but by her personal choice not to seek other employment and retire.

For support, Defendants cite *Lubke v. City of Arlington,* 455 F.3d 489 (5th Cir. 2006). In *Lubke,* the Fifth Circuit reviewed whether the district court correctly refused to offset a plaintiff's retirement plan payout, which he received at termination, against his damage award in an action under Family Medical Leave Act. *Id.* at 499. The Fifth Circuit rejected the district court's approach and concluded that, even though

1  both the plaintiff and the defendant contributed to the retirement fund,

2  offset should be allowed for the employer's portion.  *Id.* at 500.

3      The reasoning was that "[w]here the City is being sued in its

4  capacity as an employer, not as a tortfeasor, the ADEA discrimination

5  cases are more analogous."  *Id.*   The court drew this analogy after

6  holding in previous ADEA discrimination cases that back pay awards should

7  be reduced by payments received from an employer's retirement fund.  *See*

8  *Guthrie v. J.C. Penney Co., Inc.,* 803 F.2d 202, 209-10 (5th Cir. 1986).

9      The Fifth Circuit's reasoning is less persuasive considering that

10 other circuits apply the collateral source rule in ADEA cases.  *See EEOC*

11 *v. O'Grady,* 857 F.2d 383 (7th Cir. 1988) (finding that pension payments

12 were a collateral source, even though employer contributed to fund from

13 which benefits were paid, because they were "part of claimants'

14 compensation"); *Gelof v. Papineau,* 829 F.2d 452 (3d Cir. 1987) (adopting

15 a flat rule forbidding the offset of pension and unemployment benefits

16 against Title VII and ADEA back pay awards); *Davis v. ODECO, Inc.,* 18

17 F.3d 1237 (5th Cir. 1994).

18     Despite circuit inconsistency, courts agree that application of the

19 collateral source rule generally turns on the character of the benefits

20 received, as well as the source of those benefits.  *See Folkestad,* 813

21 F.2d at 1381; *Clark v. Burlington N., Inc.,* 726 F.2d 448 (8th Cir. 1984);

22 *Davis,* 18 F.3d at 1244.

23     Whether Mr. Moss correctly applied the collateral source rule has

24 no bearing on the present motion, which challenges Mr. Moss' ability to

25 provide reliable expert economic testimony.  The collateral source rule's

26 applicability is a legal issue, not an economic one.  Mr. Moss admits the

1  same: "I understand this (the applicability of the collateral source
2  rule) to be a legal issue." (Ct. Rec. 63 at 4.)  Mr. Moss properly
3  calculated Plaintiff's damages based on the available facts and
4  assumptions.

5      The Court nevertheless finds that the collateral source rule
6  applies.  Plaintiff's WPERP plan is a fringe benefit as defined under
7  *Xieng*.  Plaintiff's WPERP plan is also a collateral source because both
8  Plaintiff and the City contributed to her retirement pension. *See Doyne,*
9  953 F.2d at 451.  Defendants make a strong argument that the present
10 facts are unique because Plaintiff voluntarily chose not to seek other
11 employment and retire.  But as the Seventh Circuit stated in *O'Grady*,
12 "pension benefits may be viewed as *earned* by the claimants and therefore,
13 not paid by the employer at all . . . . [T]he pension benefits . . .
14 [are] part of the claimants' compensation."  857 F.2d at 391.

15      4. Fringe-Related Benefits

16      Defendants next argue that Mr. Moss arbitrarily assumed that
17 Plaintiff's lost job-related benefits equal 15% of her salary. (Ct. Rec.
18 69 at 3.)  In his declaration, Mr. Moss states that his figures are based
19 on extensive experience reviewing fringe-benefit packages offered by
20 public sector employers in the northwest.  (Ct. Rec. 63 at 5.)

21      5. Zero Net Discount Rate

22      Defendants criticize Mr. Moss' application of a zero net discount
23 rate in discounting Plaintiff's future income loss to present cash value.
24 (Ct. Rec. 69 at 3.)  Mr. Moss responds that economists differ on the
25 appropriate net discount rate to apply and, after reviewing the present
26 facts, determined that a zero discount rate "reasonably reflects the

facts of the high inflation years started in the late 1970's . . . ."
(Ct. Rec. 63 at 5-6.)

After considering Defendants' various criticisms, the Court finds Mr. Moss' methodologies are reliable and his assumptions are valid and grounded in the present case's facts. *See Quinones-Pacheco v. Am. Airlines, Inc.,* 979 F.2d 1, 6 (1st Cir. 1992). Defendants attack Mr. Moss' opinions and methodology as "bald assertions" lacking support. (Ct. Rec. 69 at 4.) While Plaintiff does not cite to treatises or peer-reviewed articles that back Mr. Moss' methodologies, this shortcoming is not fatal because reliability may be demonstrated through other methods, including experience. *See Hangarter v. Provident Life and Acc. Inc. Co.,* 373 F.3d 998, 1015-16 (9th Cir. 2004); *Thomas v. Newton Int'l Enters.,* 42 F.3d 1266, 1269-70 (9th Cir. 1996). After all, the central focus of the trial court's gatekeeping requirement "is to make certain that an expert, whether basing testimony upon professional studies or personal experiences, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. Ltd.,* 526 U.S. at 152.

The Court finds that Mr. Moss' methodologies are reliable and that he employed sufficient intellectual rigor in reaching his opinions. Mr. Moss has qualified to testify at trial on economic issues over seventy (70) times between 2003 and 2007. Notably, he was recently found qualified to testify as an expert about lost wages and future earnings by this Court in *Bear v. Ford Motor Company, Inc., et. al.,* CV-05-253-EFS (where he utilized several of the same economic methodologies as here).

Mr. Moss' report and declaration indicate that his assumptions were valid and based on the facts known to him as he prepared his economic report.  As Plaintiff correctly points out, Defendants' critiques are largely based on conflicting economic methodologies for calculating lost wages.  Defendants are adamant that Mr. Moss' opinions are based on shaky evidence.  Defendants' challenges are appropriately addressed through vigorous cross-examination and presentation of contrary evidence.  *See Daubert I,* 509 U.S. at 596.

**C. Helpfulness**

The Ninth Circuit has stated that "[f]ederal judges must . . . exclude proffered scientific evidence under Rules 702 and 403 unless they are convinced that it speaks clearly and directly to an issue in dispute in the case, and that it will not mislead the jury." *Daubert II,* 43 F.3d at 1321 n.17.

Here, Mr. Moss' testimony will be helpful to the jury because his testimony speaks clearly and directly to Plaintiff's lost wages after her job was "defunded," a disputed issue in this case.  Accordingly, Defendants' Motion to Exclude Testimony of Plaintiffs' Expert Witness Robert Moss Under *Daubert* (Ct. Rec. 41) is DENIED.

**III. Motions for Summary Judgment (Ct. Recs. 31 & 38)**

**A. Summary Judgment Standard**

Summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c) (2008).  Once a party has moved for

1    summary judgment, the opposing party must point to specific facts
2    establishing that there is a genuine issue for trial. *Celotex Corp. v.*
3    *Catrett*, 477 U.S. 317, 324 (1986). If the nonmoving party fails to make
4    such a showing for any of the elements essential to its case for which
5    it bears the burden of proof, the trial court should grant the summary
6    judgment motion. *Id.* at 322. "When the moving party has carried its
7    burden of [showing that it is entitled to judgment as a matter of law],
8    its opponent must do more than show that there is some metaphysical doubt
9    as to material facts. In the language of [Rule 56], the nonmoving party
10   must come forward with 'specific facts showing that there is a genuine
11   issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
12   475 U.S. 574, 586-87 (1986) (citations omitted) (emphasis in original
13   opinion).

14       When considering a motion for summary judgment, a court should not
15   weigh the evidence or assess credibility; instead, "the evidence of the
16   non-movant is to be believed, and all justifiable inferences are to be
17   drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255
18   (1986). This does not mean that a court will accept as true assertions
19   made by the non-moving party that are flatly contradicted by the record.
20   *See Scott v. Harris*, 127 S. Ct. 1769, 1776 (2007) ("When opposing parties
21   tell two different stories, one of which is blatantly contradicted by the
22   record, so that no reasonable jury could believe it, a court should not
23   adopt that version of the facts for purposes of ruling on a motion for
24   summary judgment.").

25       When parties file cross-motions for summary judgment, "the court
26   must rule on each party's motion on an individual and separate basis,

determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard." *Fair Hous. Council of Riverside County v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001). In fulfilling its duty to review each cross-motion separately, the court must review the evidence submitted in support of each cross-motion. *Id.*

Plaintiff alleges that Defendants: 1) retaliated against her in violation of the First Amendment by defunding her position; 2) denied her protected property rights under the Fourteenth Amendment; and 3) denied her protected liberty interests under the Fourteenth Amendment. (Ct. Rec. 1.) Each claim will be addressed in turn.

**A. First Amendment Retaliation Claim**

After reviewing Defendants' moving papers, Plaintiff agrees to dismiss this claim. (Ct. Rec. 54 at 2.)[5] This claim is properly dismissed.

**B. Property Interest Under the Fourteenth Amendment[6]**

Plaintiff claims that she has a constitutionally protected property interest in continued employment with the City. (Ct. Rec. 54 at 4.) Defendants respond that Plaintiff had no protected property interest because she was an at-will employee. (Ct. Rec. 71 at 10.)

The Fourteenth Amendment's due process guarantee applies when a plaintiff possesses a constitutionally protected property interest in a benefit that is at stake. *Matthews v. Harney County, Oregon Sch. Dist.*

---

[5]Morever, Plaintiff conceded dismissal is appropriate at oral argument.

[6]Both parties move for summary judgment on this issue.

ORDER ~ 18

*No. 4,* 819 F.2d 889, 891 (9th Cir. 1987) (citations omitted); *Brewster v. Bd. of Educ.,* 149 F.3d 971, 982 (9th Cir. 1998), *cert. denied,* 526 U.S. 1018 (1999).

Whether a property interest exists is not determined by reference to the Constitution; rather, property interests are "created and their dimensions defined by existing rules or understandings that stem from an independent source such as state law - rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Bd. of Regents v. Roth,* 408 U.S. 564, 567 (1972). A property interest can be created by a state statute, a formal contract, or a contract implied from the circumstances. *See Perry v. Sindermann,* 408 U.S. 593, 602 (1972); *Bailey v. Floyd Bd. of Educ.,* 106 F.3d 135, 141 (6th Cir. 1997).

To prevail on her claim, Plaintiff must establish that she had a property interest in continued employment with the City. "An individual has a constitutionally protected property interest in continued employment . . . if [she] has a reasonable expectation or a legitimate claim of entitlement to it, rather than a mere unilateral expectation. *Sonoda v. Cabrera,* 255 F.3d 1035, 1040 (9th Cir. 2001) (citation and internal quotations omitted). At-will employees have no property interest requiring due process protection. *See, e.g., Hollister v. Forsythe,* 22 F.3d 950, 952 (9th Cir. 1994); *Ogilbee v. Western Dist. Guidance Ctr., Inc.,* 658 F.3d 257 (4th Cir. 1981); *Perkins v. Bd. of Directors of Sch. Admin. Dist. No. 13,* 686 F.2d (1st Cir. 1982). But employment relationships that are terminable at will can be modified by

statements contained in policy manuals or handbooks. *Thompson v. St. Regis Paper Co.,* 102 Wn.2d 219, 228 (1984).

At first glance, Plaintiff was an at-will employee lacking a property interest requiring due process protection. *See* City Ordinance 2.48.010 (stating that the city manager shall "shall serve at the pleasure of the mayor and council"); *Guy v. Mohave County,* 701 F.2d 73, 77 (9th Cir. 1982) (recognizing that public employees who serve at the pleasure of an appointing authority may be terminated at will). But Plaintiff also received a policy manual.

Section 3.4 of the policy manual discusses probationary periods. Subsection (a) states that all newly-hired employees, former employees who have been rehired, or employees promoted to a new classification enter a probation period. (Ct. Rec. 77 at 3.) Generally, the probation period is twelve (12) months and, during that period, an employee may be terminated at any time with or without cause. *Id.*

Plaintiff insists the obvious inferences is that, after the twelve-month probationary period, City employees can only be terminated for just cause. (Ct. Rec. 54 at 7.) Thus, her position was not terminable at will and she had a constitutionally protected property interest in continued employment. Defendants disagree, pointing to the policy manual's disclaimer located in the preamble, which states:

> This manual is a general informational guide to the City's current employment policies and shall not be construed as a contract . . . . These policies shall not be construed to create contractual rights or any type of promise or guarantees of specific treatment upon which any employee may rely. The City also reserves the right to deviate from these policies in individual situations, in order to achieve its primary mission of providing orderly and cost efficient services to its

citizens.  This manual creates no rights in any third person or party.

(Ct. Rec. 47, Ex. MM.)  Defendants, relying on *Swanson v. Liquid Air Corporation,* 118 Wn.2d 512, 526 (1992), state that the disclaimer forecloses any argument that the policy manual modified Plaintiff's at-will status.  (Ct. Rec. 71 at 5.)  In *Swanson,* the Washington Supreme Court noted that employers can generally disclaim what might otherwise appear to be enforceable promises in handbooks or manuals or similar documents.  118 Wn.2d at 526.  To do so, effective disclaimers must, at a minimum, "state in a conspicuous manner that nothing contained in the handbook, manual, or similar document is intended to be part of the employment relationship and that such statements are instead simply general statements of company policy."  *Id.* at 527 (citations omitted).

Here, genuine factual issues exist as to whether Plaintiff's employee manual modified her at-will employment status and created a protected property interest in continued employment.

The Court recognizes that Plaintiff received and read the policy manual (and its disclaimer).  The Court also recognizes Defendants' cited authority where a court examined a disclaimer similar to the one at hand and concluded an employee did not have a protected property interest in continued employment.  *See Bjorn v. Associated Reg'l and Univ. Pathologists, Inc.,* 208 Ill. App. 3d 505, 508 (1990) (rejecting a claim that a manual containing a provision stating that probationary employees could be terminated without cause leads to an inference that employees beyond the probationary period could only be terminated for cause).

ORDER ~ 21

1    But a disclaimer may be negated by inconsistent employer
2  representations and practices. *Swanson,* 118 Wn.2d at 534.  Here, Mayor
3  Reeves testified it was his understanding that an employee who
4  successfully completes the probationary period could be terminated only
5  for just cause. (Ct. Rec. 33-2 at 15.)  Mayor Reeves' understanding is
6  a relevant consideration. *See Swanson,* 118 Wn.2d at 528 (noting that
7  extrinsic evidence is admissible as to the entire circumstances under
8  which the contract was made as an aid in determining the parties'
9  intent).  Accordingly, whether the City's disclaimer was effective and
10 whether the policy manual modified Plaintiff's employment status and
11 created a protectable property interest are factual issues for the jury.
12 *See id.* at 538.

13   Defendants also assert that Plaintiffs' claim against the City must
14 fail because there is no causal connection between the alleged denial of
15 Plaintiff's due process rights (receipt of a *Loudermill* hearing) and the
16 city council's decision to defund Plaintiff's position.

17   Plaintiff's underlying issue is that her due process rights were
18 violated because she was entitled to a *Loudermill* hearing before being
19 terminated.  Mayor Reeves testified that it was his decision alone on
20 whether or not to grant a *Loudermill* hearing. (Ct. Rec. 77 at 13.)  He
21 did not give Plaintiff a *Loudermill* hearing because her termination was
22 caused by a lack of funding and there was nothing that could be done.
23 *Id.*  Plaintiff agrees that a *Loudermill* hearing would have been futile.
24 *Id.*

25   Plaintiff did not name Mayor Reeves as a defendant in either his
26 individual or official capacity.  Nor did Plaintiff allege claims against

the individual city council members.  Accordingly, Plaintiff's claims are against the City itself.

A local government entity cannot be held liable under 42 U.S.C. § 1983 unless the plaintiff alleges that the action inflicting injury flowed from either an explicitly adopted or a tacitly authorized governmental policy.  *Gibson v. United States,* 781 F.2d 1334, 1337 (9th Cir. 1986).  There must be a direct causal link between the municipal policy or custom and the alleged constitutional deprivation.  *Galen v. County of Los Angeles,* 468 F.3d 563, 577 (9th Cir. 2006) (citations omitted).  Defendant agrees that the city council's defunding constitutes a "municipal policy," but insists that the policy/decision to defund is not related to Plaintiff's denial of a *Loudermill* hearing - that was Mayor Reeves' decision.

A causal connection exists.  The Ninth Circuit inquiry focuses whether a policy/decision was the "moving force" behind the constitutional violation.  *Galen,* 468 F.3d at 577.  Here, the city council's decision was the "moving force" because their defunding decision made Plaintiff's receipt of a meaningful *Loudermill* hearing futile - this affected her due process rights.

**C. Fourteenth Amendment Liberty Interest**

Defendants argue that Plaintiff's liberty interests were not violated because 1) she did not request a name clearing hearing and, even if she did, 2) her departure did not warrant such a hearing. (Ct. Rec. 42 at 14.)  Plaintiff responds that this issue should be resolved by the jury.  (Ct. Rec. 54 at 15.)

ORDER ~ 23

1    The Fourteenth Amendment's due process guarantee also applies when

2  a constitutionally protected liberty interest is at stake. *Matthews v.*

3  *Harney County, Oregon Sch. Dist. No. 4,* 819 F.2d 889, 891 (9th Cir. 1987)

4  (citations omitted).  The liberty interest protected by the due process

5  clause encompasses an individual's freedom to work and earn a living.

6  *Bollow v. Fed. Reserve Bank,* 650 F.2d 1093, 1100 (9th Cir. 1981).  So

7  when a state actor dismisses an individual for reasons that might

8  seriously damage her standing and associations in the community, she is

9  entitled to notice and a hearing to clear her name.  *Id.* at 1101; *Roth,*

10  408 U.S. at 573 ("[W]here a person's good name, reputation, honor, or

11  integrity is at stake because of what the government is doing to him,

12  notice and an opportunity to be heard are essential.").

13    To implicate constitutional liberty interests, however, the reasons

14  for dismissal must be sufficiently serious to "stigmatize" or otherwise

15  burden the individual so that she is not able to take advantage of other

16  employment opportunities.  *Roth,* 408 U.S. at 573-74.  The Ninth Circuit

17  has determined that a former employee's liberty interest is implicated

18  where the state employer made charges that impair a reputation for

19  honesty or morality and where: (1) the accuracy of the charge is

20  contested; (2) there is some public disclosure of the charge; and (3) the

21  charge is made in connection with termination of employment.  *Matthews,*

22  819 F.2d at 892.  If these conditions are met, due process requires a

23  pre-termination hearing that "affords the employee notice and a

24  meaningful opportunity to speak in [her] own defense."  *Id.*

25

26

ORDER ~ 24

### 1. Failure to Request Hearing

Here, Plaintiff's liberty claim is properly barred because she failed to request a name-clearing hearing. While the Ninth Circuit lacks a published decision on point, other circuit authority is instructive.

In *Quinn v. Shirley,* 293 F.3d 315, 321 (6th Cir. 2002), the Sixth Circuit acknowledged that a name-clearing hearing's purpose "is to afford the aggrieved employee an opportunity to be heard to refute the charges disseminated against [her]." *Id.* at 322. The Sixth Circuit went on to hold, however, that a plaintiff's failure to request a name-clearing hearing is fatal to [her] liberty interest claim. *Id.* Other circuits agree. *See Gillum v. City of Kerrville,* 3 F.3d 117, 121 (5th Cir. 1993) (same); *Winskowski v. City of Stephen,* 442 F.3d 1107 (8th Cir. 2006) (holding that an employee who fails to request post-termination process cannot later sue for having been deprived of it).[7] The First Circuit also has authority that inferentially implies a plaintiff's failure to request a name-clearing hearing is fatal. *See Burton v. Town of Littleton,* 426 F.3d 9 (1st Cir. 2005) (noting the plaintiff must show that the government failed to comply with the employee's request for an adequate name-clearing opportunity in order to establish a liberty interest claim).

---

[7]*But see Eames v. Logan,* 762 F.2d 83 (10th Cir. 1985) (finding that a plaintiff's failure to request a name-clearing hearing does not defeat his claim).

ORDER ~ 25

1    The Sixth Circuit's reasoning in *Quinn* is persuasive; Plaintiff's

2  failure to request a name-clearing hearing bars her liberty interest

3  claim.

4            **2. Opportunity to Do So**

5    The Court alternatively finds that Plaintiff had the opportunity to

6  exercise her due process protections by participating in a name-clearing

7  hearing but declined to do so.

8    It should first be noted that some circuits require public employers

9  to inform employees that they have an opportunity to clear their name

10 upon request. *See, e.g., In re Selcraig,* 705 F.2d 789, 796 (5th Cir.

11 1983); *Buxton v. City of Plant City,* 871 F.2d 1037, 1046 (11th Cir.

12 1989). Here, Plaintiff does not claim that she was unaware she was

13 entitled to a name-clearing hearing and that the City failed to notify

14 her of this right.

15   In fact, Plaintiff was given at least one opportunity to clear her

16 name. In December 2004, Plaintiff asserted retaliation claims against

17 the council members who attempted to defund her position, alleging that

18 they "participated in a premeditated, jointly choreographed . . . attempt

19 to . . . harass, intimidate, publicly humiliate, and defame [Plaintiff's]

20 personal and professional character . . . ." (Ct. Rec. 47, Ex. AA.) The

21 City offered Plaintiff a hearing before an administrative law judge to

22 address the retaliation claim. (Ct. Rec. 47, Ex. EE.) She did not

23 respond.

24   True, the City's hearing offer concerned Plaintiff's retaliation

25 claim. But Plaintiff's retaliation claim allegations are substantively

26 identical to the allegations here - specifically, the criticisms of her

job performance were unjust and the city council made statements that
seriously damaged her reputation.  Practically speaking, if Plaintiff was
truly concerned about her damaged reputation, the sooner she could
participate in a name-clearing hearing the better.

The City's hearing offer in January 2005 (shortly after the city
council attempted to defund her position) was the ideal time to explore
and address the allegedly defamatory statements and criticisms of her
performance as city manager.  Plaintiff would have been entitled to
representation by legal counsel, the ability to examine and cross-examine
witnesses, and the ability to present name-clearing evidence, all in a
public proceeding.  Her hearing rights would have more than satisfied
Fourteenth Amendment due process requirements.  *See Roth,* 408 U.S. at
573.

But Plaintiff did not respond.  In fact, Plaintiff took *no action*
after the release of the police department's no confidence petition, the
fire department's no confidence petition, the citizens' no confidence
petition, and the NWSC's report that sharply criticized her performance.
These were the events that lead to the city council's initial attempts
to defund Plaintiff's position and could have been addressed at the
administrative hearing, if one was held.  The fact that Plaintiff's
actual defunding/termination did not occur until six (6) months after the
January 2005 hearing offer is unimportant.  The proper time to address
Plaintiff's reputation concerns was when the reputation-damaging comments
were made.  Due process protections for liberty interests are principally

in place to protect an individual's reputation. *See Bollow,* 650 F.2d at 1100.[8]  There is no set time line for honoring those protections.

Even viewing the facts in Plaintiff's favor, she made no effort to participate in a name-clearing hearing when given the opportunity to do so; she also made no effort to request a name-clearing hearing at any other time.  Plaintiff was given the opportunity to exercise her due process rights - she declined. She should not now be allowed to allege violations for a right she had but did not exercise.  Based on Fifth, Sixth, and Eighth Circuit authority, her claim is properly barred.

Accordingly, **IT IS HEREBY ORDERED:**

1. Defendants' Motion to Exclude Testimony of Plaintiffs' Economic Expert for Plaintiffs' Failure to Mitigate Damages **(Ct. Rec. 35)** is **DENIED.**

2. Defendants' Motion to Exclude Testimony of Plaintiffs' Expert Witness Robert Moss Under *Daubert* **(Ct. Rec. 41)** is **DENIED.**

3. Plaintiff's Motion for Partial Summary Judgment: Property Interest Claim **(Ct. Rec. 31)** is **DENIED.**

4. Defendants' Motion for Summary Judgment **(Ct. Rec. 38)** is **GRANTED IN PART** (First Amendment Claim and Liberty Claim) and **DENIED IN PART** (remainder).

_____

[8]Due process rights also exist to protect an individual's freedom to work and earn a living. *Id.*  It is hard to say Plaintiff's freedom to work, earn a living, and find a job were harmed considering she voluntarily retired and made no effort to find alternative employment.

ORDER ~ 28

**IT IS SO ORDERED.**  The District Court Executive is directed to enter this Order and distribute copies to counsel.

**DATED** this ___30th___ day of June 2008.

                              S/ Edward F. Shea
                    _____
                              EDWARD F. SHEA
                       United States District Judge

Q:\Civil\2007\3023.MSJ.wpd

ORDER ~ 29